# Court of Appeals.

### June 6, 1893.

## PEOPLE v. CHARLES F. PECK.

### (52 St. Rep. 907; 138 N. Y. 385)

**1. Criminal law—Public records—Destruction.**

>   The commissioner of statistics of labor is a public officer and the room assigned to him is a public office.

**2. Same.**

>   It is the duty of such commissioner, after gathering the facts from manufacturers, etc., to preserve them, and he may be punished under section 94 of the Penal Code for destroying the answers made to his circulars calling for statistical details.

**3. Same.**

>   Papers, which a public officer is required to obtain in the discharge of his official duties, and which have public importance and are of permanent value and may serve a useful purpose after they have been deposited in his office or with him, are under the protection of the law.

**4. Same.**

>   The statute makes it the duty of the commissioner to procure the information and makes it the duty of the persons designated to give it, and, when the information is given, it becomes public and is for a public purpose and no stipulation or promise on the part of the commissioner can give it any other character.

Appeal from the judgment of the general term of the supreme court, third department, reversing the judgment of the court of

sessions of Albany county, which sustained the demurrer to the indictment against the defendants and discharging them.

The indictment is as follows:

The grand jury of the county of Albany accuse Charles F. Peck and Elbert Rodgers of the crime of removing and destroying public documents, committed as follows:

"The said Charles F. Peck, heretofore and at the time of the commission of the acts hereafter stated, was and now is the commissioner of statistics of labor of the state of New York, a public officer and a public office duly created by an act of the legislature of the state of New York, and as such commissioner it became and was his duty to collect, assort, systematize and present, in annual reports to the legislature, statistical details relating to all departments of labor in this state, and especially in relation to the commercial, industrial, social and sanitary conditions of workingmen, and to the productive industries of this state; and that at all the times hereafter referred to it was the legal duty of every person, owner, operator, manager and lessee of every mine, factory, workshop, warehouse, elevator, foundry, machine shop and other manufacturing establishment in the state, and of every agent and employe of such owner, operator, manager and lessee of every such mine, factory, work-shop, warehouse, elevator, foundry, machine-shop and other manufacturing establishment, to furnish to such commissioner, when requested by him, statistical and other information, in their possession or under their control, relative to the lawful duties of such commissioner as above set forth, and to truthfully answer questions concerning such lawful duties of the said commissioner sent to them by said commissioner by circular.

"That heretofore and in the year 1891, between the first day of January and the 31st day of December in said year, and in the year 1892, between the 1st day of January and the 1st day of September in said year, the said defendant, Charles F. Peck, as Commissioner of Statistics of Labor of the State of New York, in pursuance of the duties devolved on him by law to collect, assort and systematize statistical details relating to all departments of labor in this state, and especially in relation to the commercial, industrial, social and sanitary condition of the working-men, and to the productive industries of this state, sent circulars

to the owners, operators, managers and lessees of the mines, factories, workshops, warehouses, elevators, foundries, machine shops and other manufacturing establishments of this state, which said circulars did then and there contain questions asking for statistical information relating to the lawful duties of such commissioner, and relating to the details of all departments of labor in this state, and especially in relation to the commercial, industrial, social and sanitary condition of workingmen in this state, and to the productive industries of this state, and did at the times aforesaid receive answers to the questions contained in said circulars from the owners, operators, managers and lessees of the mines, factories, workshops, warehouses, elevators, foundries, machine shops and other manufacturing establishments of this state, which said answers were contained in and written on the circulars so sent out by the said Charles F. Peck, as Commissioner of Statistics of Labor of the State of New York, and which said answers, then and there being, were and are the statistical details relating to all departments of labor in the state of New York, and especially in relation to the commercial, industrial, social and sanitary condition of workingmen of the state of New York and to the productive industries of the state of New York, and which said circulars containing the questions aforesaid, and the answers aforesaid, were sent to and received by the said defendant, Charles F. Peck, as such Commissioner of Statistics of Labor of the State of New York, by due authority of law, at his office in the new capitol in the city of Albany, and known as the Bureau of Labor Statistics of the State of New York, he, the said Charles F. Peck, being then and there a public officer of the state of New York, and received and filed and deposited by said Charles F. Peck in the office of the Bureau of Labor Statistics of the State of New York, at the headquarters thereof in the new capitol, in the city of Albany, the said Bureau of Labor Statistics being and was then and there a public office of the state of New York, and being then and there received, filed and deposited by due authority of law, and being and were then and there public records, books, papers and documents of the state of New York.

And the grand jury further say that the said Charles F. Peck and Elbert Rodgers, on the 11th day of September, 1892,

at the city of Albany, in this county, feloniously, wilfully and unlawfully did remove, mutilate, conceal and destroy the public records, books, papers and documents so as aforesaid filed and deposited by due authority of law in the office of the Bureau of Labor Statistics of the state of New York, in the new capitol, at the city of Albany, the same being then and there a public office of the state of New York, and the same being then and there filed and deposited by due authority of law, with the Commissioner of Statistics of Labor of the state of New York, at his office in the new capitol, in the city of Albany, he being then and there a public officer of the state of New York, and which said public records, books, papers and documents aforesaid, did then and there relate to and were the official statistical details relating to all departments of labor in the state of New York, and especially in relation to the commercial, industrial, social and sanitary condition of the workingmen of the state of New York, and to the productive industries of the state of New York for the years 1890 and 1891, and were and are the official and public records, books, papers and documents of the Bureau of Labor Statistics of the State of New York, and the official and public records, books, papers and documents of the People of the state of New York.

"And the grand jury aforesaid further say that the public records, books, papers and documents aforesaid have been and are withheld by the said Charles F. Peck and Elbert Rodgers, and have been and were removed and mutilated by the said Charles F. Peck and Elbert Rodgers, and have been destroyed by the said Charles F. Peck and Elbert Rodgers, so that the grand jury are unable to give a better description of them than as above set forth, and so that the grand jury are unable to set them out in detail, and are unable to set them out in words and figures.

"And so the grand jury aforesaid charge and accuse the said Charles F. Peck and the said Elbert Rodgers with feloniously, wilfully and unlawfully removing, mutilating, concealing and destroying public records, books, papers and documents contrary to the statute in such case made and provided.

"JAMES W. EATON,

"District Attorney of the County of Albany."

The defendants demurred separately to the indictment on the ground that it did not state facts sufficient to constitute a crime.

Edward J. Meegan, for appellants.

James W. Eaton, for respondents.

EARL, J.—Chapter 35 of the Laws of 1883, as amended by chapter 202 of the Laws of 1886, provides as follows:

"Section 1. The governor shall, by and with the advice and consent of the senate, appoint, within ten days after the passage of this act, and thereafter tri-ennially on the first Wednesday in April, some suitable person who shall be designated 'Commissioner of Statistics of Labor,' with headquarters in the new capitol at Albany.

"Section 2. The duties of such commissioner shall be to collect, assort, systematize and present in annual reports to the legislature, within ten days after the convening thereof in each year, statistical details relating to all departments of labor in the state, especially in relation to the commercial, industrial, social and sanitary condition of workingmen, and to the productive industries of the state.

"Section 3. Said commissioner shall also have power to send for persons and papers, to examine witnesses under oath, to take depositions, to cause them to be taken by others by law authorized to take depositions; and said commissioner may depute any uninterested person to serve subpoenas upon witnesses, who shall be summoned in the same manner and paid the same fees as witnesses before a county court; and any person or owner, operator, manager or lessee of any mine, factory, workshop, warehouse, elevator, foundry, machine shop or other manufacturing establishment, or any agent or employe of such owner, operator, manager or lessee, who shall refuse to said commissioner admission therein for the purpose of inspection, or who shall, when requested by him, wilfully neglect or refuse to furnish to him any statistical or other information relative to his lawful duties, which may be in their possession or under their control, or who shall wilfully neglect or refuse, for thirty days, to answer questions by circular or upon personal applica-

tion, or who shall knowingly answer any such questions untruthfully, or who shall refuse to obey the subpoenas and give testimony according to the provisions of this act, provided that no witness shall, against his will be compelled to answer any question respecting his private affairs, shall for every such wilful neglect or refusal, be deemed guilty of a misdemeanor, and, on conviction therefor, shall be punished by a fine of not less than fifty nor more than two hundred dollars."

Section 4 provides that the commissioner shall receive an annual salary of $2,500 and his expenses, and that he may appoint a clerk at an annual salary of $1,200.

There can be no doubt that the commissioner is a public officer. He has a fixed term of office, a salary and discharges duties for the public. He is to have and keep an office in the capitol, where he and his clerk are to discharge their principal functions. What can a statute mean which requires a public officer to have his "headquarters" at the capitol?

It does not mean temporary headquarters, but permanent headquarters during his term of office. It does not mean that he is to occupy the corridors, rotunda or some other open space in the capitol. Obviously it means that, like the other public officers, he is to have a room in the capitol for his occupation and for the discharge of his duties. The statute gives him the right to such a room, and thus it is made the duty of those who, by law, have charge of the capitol to assign him a room, and if they should refuse to do so they could be compelled by mandamus. The indictment shows that he did occupy a room in the capitol as his office, which was styled the Bureau of Labor Statistics. So here was a public officer and a public office officially occupied by him.

This act has relation to the workingmen of the state engaged in productive industries. They constitute a very large portion of the people. They are generally without capital and more or less dependent. The relations between capital and labor are yet an unsolved problem, and statesmen and scholars are engaged in its solution. Measures for the amelioration of the condition of workingmen and the promotion of their welfare are frequently agitated, many of which are based upon imperfect knowledge and crude ideas. Knowledge of the facts, knowl-

edge of the social condition, the wages, the material needs of the workingmen, of the profits of labor and of capital, and of the condition of the productive industries, must precede any intelligent legislation, and remedial measures looking to the welfare of workingmen, and the wise and beneficent solution of the problem above mentioned. So the main purpose of this act is to get at the facts. The primary duty of the commissioner is to collect the facts—called in the act statistical details—in relation to labor and production. Having collected the facts, then he is to assort and systematize them, and then present them in his annual report to the legislature. He is not to collect the facts merely to enable him to discharge a duty, but in the discharge of a duty. He is to collect them, not for his private, personal use, but for a public purpose—not merely to enable him to make his report, but for preservation, so long as they can be useful.

These statistical details for a single year would be inadequate for accurate deductions and generalizations. For that purpose a series of years are needed. One year may be abnormal as to the conditions of labor and industries, and thus the statistical details for that year might be misleading and illusory. The facts gathered are not only for the use of the commissioner, but for everybody who has occasion to use them; for lawmakers, for students of sociology, political economy and the science of government, and for the general historian, and they may become more valuable as the years go by and the opportunity to gather them has in a great measure passed away. Could it have been the intention of the legislature that there should be no means to test the accuracy and value of the report of the commissioner? Is he, under the act, to be permitted to present a picture of the condition of labor and the productive industries, the accuracy of which, in consequence of the suppression of the facts, cannot be tested? Shall an inferior state officer be the sole judge of the significance and value of the facts he gathers under this act? Can he be permitted to manipulate the facts to sustain some pet theory of his own, or even to serve some perverse purpose, without the opportunity of detection and exposure? It is obvious that the act would be worse than useless; might even be dangerous in its operation, if the statistical details are not to be preserved, and the manifest purpose of the

act makes it important that they should be preserved. If untruthful answers be given to questions contained in circulars sent out to the persons named in the act, any person giving such answers is guilty of a misdemeanor, and may be convicted and punished; and to this end it is important that the written answers be kept. The act clothes the commissioner with extraordinary powers to gather the facts. He may use compulsory process for that purpose, and yet may he destroy the papers and documents in which they are contained at any time after receiving them? The duty to preserve them after he has received them and they have reached his office, we think, is plain, and is implied in the act, and just as much a part thereof as if expressly written therein. United States v. Babbit, 1 Black, 55, 61; Gelpcke v. City of Dubuque, 1 Wall. 221.

It is true that the commissioner may, under the act, obtain pertinent information by observation, which may not be reduced to writing, and thus become a record. But if he examines witnesses, under the act, it is implied that such examination is to be reduced to writing, and all pertinent information which is furnished to him in writing, under the act, should be preserved by him in his office. It belongs to the public, is obtained at the public expense for the public, and should be preserved until it may be destroyed or otherwise disposed of by authority of law.

Such we believe to be the scope and purpose of the act.

It appears from the indictment that the commissioner sent out circulars calling for the statistical details mentioned in the act, and that he obtained answers to such circulars written thereon, which were filed and deposited by him in his office in the capitol, and that he and the other defendant subsequently destroyed the papers and documents thus filed and deposited; and the indictment was found against them under section 94 of the Penal Code, which provides as follows:

"A person who wilfully and unlawfully removes, mutilates, destroys, conceals or obliterates a record, map, book, paper, document or other thing filed or deposited in a public office or with any public officer by authority of law, is punishable by imprisonment for not more than five years, or by a fine of not more than five hundred dollars, or both."

We can perceive no defect in this indictment. The facts alleged therein show the commission of a crime. As we have shown, the circulars and answers written thereon were public papers or documents. They were deposited, and also, according to the general and common understanding of the term, "filed" with a public officer by authority of law, and the indictment alleges that the defendants feloniously, wilfully and unlawfully destroyed them.

It matters not, as we have shown, whether this destruction took place before or after the commissioner had prepared his report. As the destruction is alleged to have taken place on the 11th day of September, it was certainly before he had made his report to the legislature.

To test the matter a little further, suppose the commissioner resigns, or is removed from his office after he has, at great labor and expense, obtained these statistical details, can he destroy the papers containing them? Can he use such parts of them as tend to support some theory or some policy which he wishes to maintain and foster, and destroy the rest? Can a clerk in his office, or some stranger, take and destroy them without responsibility under the law? Are these valuable papers absolutely without protection except such as the commissioner may voluntarily give? Can he not be compelled to deliver them over to his successor in office under the Revised Statutes and under the Code as now amended? The answers to these questions, it seems to me, are quite obvious.

The learned counsel for the defendants claims that these circulars, with the answers therein, were not "statistics" as defined by the authorities which he cites. But that they contained statistical details, the primary elements out of which a table or system of statistics could be framed cannot be doubted.

It is quite true that every paper that comes into a public office in the performance of the duties of the officer who has charge of the office is not within the section of the Penal Code claimed to have been violated by the defendants. It is not easy to give a definition or description so comprehensive and accurate as to include every paper contemplated by the section. It is enough for the present purpose to say that papers which a public officer is required to obtain in the discharge of his official duties, which

have public importance and are of permanent value and may serve a useful purpose after they have been deposited in his office or with him, are under the protection of the law.

If these papers had actually served their whole purpose so that they could no longer be of any use, they could have been destroyed with impunity, and it cannot be supposed that it was intended by the law to save such papers from destruction.

If these papers contained material and pertinent information collected under the act and for the purposes contemplated by the act, then the indictment could not be defended on the ground that the papers were the private papers of the persons sending them to the commissioner, or that the information thus communicated was confidentially disclosed. The statute makes it the duty of the commissioner to procure the information and makes it the duty of the persons designated to give it, and when the information is given it becomes public and is for a public purpose, and no stipulation or promise on the part of the commissioner can give it any other character.

We regard this as a plain case involving no abstruse questions of law. We have not, therefore, deemed it important to refer to or criticise the authorities, having more or less bearing, cited upon the argument. They will be found in the carefully prepared briefs submitted.

We ought not to close this discussion without referring to the very able prevailing opinions delivered in the court below. We would have rested our decision upon those opinions but for the novelty of this case and its public importance.

The judgment should be affirmed.

All concur.